UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Norfolk Division)

| | |
|---|---|
| **CARSON NEWBAUER**, on behalf of himself, and all others similarly situated, | |
| Plaintiff, | |
| v. | Case No. _____ |
| **JACKSON HEWITT TAX SERVICE INC., JACKSON HEWITT INC., TAX SERVICES OF AMERICA, INC., BAYSIDE CAPITAL, INC., AND CORSAIR CAPITAL, LLC,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page(s)**

I.      SUMMARY OF THE ACTION .................................................................................1

II.     JURISDICTION AND VENUE .............................................................................3

III.    THE PARTIES .......................................................................................................4

IV.     FACTUAL ALLEGATIONS ..................................................................................7

      A.      Trade and Commerce ....................................................................................7

      B.      The Jackson Hewitt Franchise ......................................................................7

            a.      Jackson Hewitt's Franchise Model ................................................9

            b.      Jackson Hewitt's Independent Franchisees Exercise Sole and
                    Complete Decision-Making Authority as to All Employment-
                    Related Decisions of Jackson Hewitt Franchise Offices .........................10

      C.      The No-Poach Agreements Between and Among Competing Jackson
            Hewitt Locations Owned by Defendants and by Franchisees ..............................11

      D.      Employee Recruitment, Hiring, and Training.........................................................13

            a.      Jackson Hewitt Employee Training and Requirements...........................14

            b.      The Jackson Hewitt System .....................................................................17

      E.      The Purpose and Effect of the Conspiracy was to Restrict Mobility and
            Suppress Compensation for Jackson Hewitt Tax Professionals ..........................17

            a.      Restricted and Reduced Mobility...............................................................17

             b.      Suppressed Compensation .......................................................................18

      F.      Illegality and Anticompetitive Harm of Franchise No-Poach Agreements ...........19

V.      CO-CONSPIRATORS AND AGENTS ...............................................................19

VI.     CLASS ACTION ALLEGATIONS .....................................................................20

VII.    ANTICOMPETITIVE EFFECTS AND LACK OF PROCOMPETITIVE
        JUSTIFICATION.................................................................................................22

VIII.   EQUITABLE TOLLING AND STATUTE OF LIMITATIONS..........................24

IX.     CLAIM FOR RELIEF .........................................................................................25

X.      DEMAND FOR JURY TRIAL............................................................................26

XI.     PRAYER FOR RELIEF.......................................................................................26

i

Plaintiff Carson Newbauer brings this action under the antitrust laws of the United States on behalf of himself and a Class of all others similarly situated (the "Class," defined below), against Defendants Jackson Hewitt Inc., Tax Services of America, Inc., Jackson Hewitt Tax Service Inc. (together, "Jackson Hewitt"), Bayside Capital, Inc., and Corsair Capital, LLC (together, "Defendants"), based on Defendants' and unnamed co-conspirators' unlawful conspiracy to suppress Plaintiff's and Class members' compensation. All allegations are upon information and belief based upon the investigation of counsel, other than those concerning Plaintiff personally.

Plaintiff brings this action to recover damages, including treble damages and other appropriate relief, and further alleges as follows:

## I.   SUMMARY OF THE ACTION

1.      This is an antitrust Class action brought by and on behalf of individuals who work or have worked for Jackson Hewitt, a tax preparation services provider and franchisor, and for franchise locations of Jackson Hewitt.

2.      Defendant Jackson Hewitt Inc. is the second largest consumer tax services provider in the United States and provides tax preparation and assistance services at physical offices, online, and via desktop and mobile applications. Jackson Hewitt Defendants provide in-person tax preparation services at nearly 6,000 offices in the United States. Of those offices, 3,900 are franchise locations and 1,800 are corporate-owned.

3.      Tax preparation personnel, like personnel in any labor market, benefit when their employers compete for their services. Competition in the labor market creates leverage for personnel, which in turn leads to higher wages and greater mobility.

1

4.      Beginning at least by January 2005, the exact date currently unknown to Plaintiffs, and continuing until the present, Defendants, along with other unnamed persons and entities acting as co-conspirators, engaged in a conspiracy with respect to the recruiting of employees and potential employees, including but not limited to agreements not to solicit, recruit, or hire without prior approval each other's personnel (the "No-Poach/No-Hire Conspiracy" or "Conspiracy"). Defendants formed, entered into, carried out, and enforced the anti-competitive contract, combination, or conspiracy described herein. Defendants orchestrated, dispersed, and enforced the agreement among themselves and all franchisees, including at least in part through an explicit contractual prohibition ("No-Poach Clause") contained in standard Jackson Hewitt franchise agreements. The Conspiracy, which is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, limited Plaintiff's and Class members' job mobility and suppressed their compensation below the levels that would have been available absent the Conspiracy.

5.      The standard Jackson Hewitt franchise agreement(s) in effect during the Class Period included, and still includes, a "Covenant Against Recruiting or Hiring Our Employees" clause, which provides that, during the term of the franchise agreement and for a period of two years afterward, the franchisee may not, without "prior written permission" from Jackson Hewitt, "solicit, recruit, or hire, for a job position entailing tax preparation, tax preparation management or supervisory duties, or tax preparation instruction duties" for persons whose duties include(d) "management of or over company-owned or franchised stores, franchisee training, tax preparation software writing or debugging, tax return processing software writing or debugging, electronic filing of tax returns, tax return processing, processing support, tax return preparation, or tax return preparation advice or support." This prohibition against soliciting, recruiting, or

I-1580339.1

hiring such employees remains in effect for one year after the termination of their employment with Jackson Hewitt or its affiliates.

6.      The Conspiracy involves, at a minimum, Jackson Hewitt as well as its franchisees. Instead of a one-way agreement by franchisees to not solicit or recruit employees from either other franchisees or from Jackson Hewitt's company-owned stores, Jackson Hewitt itself adhered to the same agreement in the operation of its company-owned stores.

7.      The purpose and effect of the restraint was to limit and suppress mobility and compensation for Class members, including those who did not try—and failed—to be recruited or hired by another Jackson Hewitt corporate or franchise location.

8.      These agreements impeded or restricted the movement of employees between Jackson Hewitt and its franchisees. These agreements also prohibited and prevented competition for employees between and among the members of the Conspiracy, including Jackson Hewitt and its franchisees. The agreements unreasonably limited franchisees' ability to solicit employees who work for Jackson Hewitt or other franchisees, reducing the pool of experienced candidates available to them, and decreasing the employment options available to current employees. Basic economic principles inform that a reduction in the pool of potential employers tends to lower the bargaining power of employees and depress wages, especially if the lost opportunities were superior to their current employment.

## II.      JURISDICTION AND VENUE

9.      Plaintiff Carson Newbauer brings this action to obtain injunctive relief and recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

10.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and 28 U.S.C. §§ 1331 and 1337.

11.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims alleged herein occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and Defendants reside in, can be found in, and/or transacts business in this District.

12.     Defendants are subject to the jurisdiction of this Court by virtue of Defendants' nationwide contacts and other activities, as well as their contacts with the state of Virginia. In particular, each Defendant, among other things: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts throughout the United States, including in this District; and/or (c) was engaged in an illegal conspiracy that was, in part, entered into in this District and was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District.

13.     In particular, Defendant Jackson Hewitt Inc. was incorporated in Virginia, and the Jackson Hewitt business was founded in and began operations in Norfolk, Virginia.

### III.     THE PARTIES

14.     Plaintiff Carson Newbauer is an individual residing in Saginaw, Michigan. During the Class Period, Mr. Newbauer worked as an Assistant General Manager for franchise locations of Jackson Hewitt that were owned by the same Jackson Hewitt franchisee, Dara Ana Tax Service. As a result of the Conspiracy, Mr. Newbauer's compensation was suppressed during the time he worked for Jackson Hewitt franchise locations.

4

15.    Defendant Jackson Hewitt Tax Service Inc. is a privately held company incorporated in Delaware with its principal place of business at 10 Exchange Place, 27th Floor, in Jersey City, New Jersey. Jackson Hewitt Tax Service Inc. is a leading tax preparation and assistance company which provides services in-person, online, and through desktop and mobile application software. The only material asset of Jackson Hewitt Tax Service Inc. is 100% of the equity of Jackson Hewitt Inc.

16.    Defendant Jackson Hewitt Inc. is a wholly-owned subsidiary of Defendant Jackson Hewitt Tax Service Inc. Jackson Hewitt Inc. was incorporated in Virginia and is also headquartered at 10 Exchange Place, 27th Floor, in Jersey City, New Jersey.

17.    Defendant Tax Services of America, Inc. is a wholly-owned subsidiary of Defendant Jackson Tax Service Inc. It was incorporated in Texas and is also headquartered at 10 Exchange Place in Jersey City, New Jersey. Defendant Jackson Hewitt Tax Services Inc. operates its corporate-owned locations through Defendant Tax Services of America, Inc.

18.    Defendant Jackson Hewitt Tax Service Inc., Defendant Jackson Hewitt Inc. and Defendant Tax Services of America, Inc. together, are referred to herein as Jackson Hewitt.

19.    Defendant Bayside Capital, Inc. is a corporation with headquarters located at 1450 Brickell Avenue, Miami, Florida. Bayside Capital, Inc. is the credit-oriented affiliate of H.I.G. Capital, a corporation with headquarters also located at 1450 Brickell Avenue, Miami, Florida. From in or around August 2011 until in or around May 2018, Bayside Capital, Inc. was the majority owner of Defendant Jackson Hewitt Tax Service Inc. Defendant Bayside Capital, Inc. is referred to herein as "H.I.G. Bayside Capital." H.I.G. Bayside Capital controlled Jackson Hewitt during the relevant period up until the sale of Jackson Hewitt. H.I.G. Bayside Capital was aware of and authorized the illegal agreements alleged herein.

20.     Defendant Corsair Capital, LLC is a private equity firm with headquarters located at 717 Fifth Avenue, 24th Floor, in New York City, New York. In or around May 2018, Corsair Capital, LLC acquired Defendant Jackson Hewitt Tax Service Inc. from H.I.G. Bayside Capital. Jackson Hewitt Tax Service Inc. is currently owned by Corsair Capital, LLC, referred to herein as "Corsair Capital." Corsair Capital controlled Jackson Hewitt during the relevant period following its acquisition. Corsair Capital was aware of and authorized the illegal agreements alleged herein.

21.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit and the identities of which are presently unknown, including Jackson Hewitt franchisees as well as direct and indirect subsidiaries of Defendant Jackson Hewitt Inc. that operate company-owned stores, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy, or in furtherance of the anticompetitive conduct. Plaintiff reserves the right to name some or all of these persons and entities at a later date.

22.     Whenever this Complaint references any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## IV.   FACTUAL ALLEGATIONS

### A.   Trade and Commerce

23.      Throughout the Class Period (as defined below), Defendants and co-conspirators employed Class members throughout the United States, including in this District.

24.      Defendants' conduct substantially affected interstate commerce, and caused antitrust injury, throughout the United States.

### B.   The Jackson Hewitt Franchise

25.      Jackson Hewitt was founded in 1982 by John Hewitt, a former Regional Manager of H&R Block, who started working for H&R Block in 1969. Hewitt, along with a group of investors, purchased the six-location Mel Jackson's Tax Service of Norfolk, Virginia in 1982 and renamed it Jackson Hewitt.

26.      Jackson Hewitt began selling franchises in 1986 and began contracting with the Montgomery Ward department store chain in 1989 to open offices in 169 of its store locations. By 1992, Jackson Hewitt became the second-largest tax preparation chain, behind H&R Block. Since then, Jackson Hewitt has opened locations in national retail chains including Wal-Mart, Sam's Club, Kmart, and Sears.

27.      Jackson Hewitt Tax Service Inc. underwent an initial public offering (IPO) on the New York Stock Exchange (NYSE) in June 2004, offering 37,500,000 shares at $17.00 per share. Following the IPO, Jackson Hewitt Tax Service Inc. was traded on the NYSE under the stock symbol JTX.

28.      After experiencing difficulties related to its then-common practice of offering refund anticipation loans—short-term loans with high interest rates primarily made to cash-

7

strapped filers in anticipation of receiving tax refunds—Jackson Hewitt Tax Service Inc. filed for Chapter 11 bankruptcy in May 2011 and ceased being traded on the NYSE.

29.     As reported in Jackson Hewitt's 2010 10-K Report, the most recent year in which Jackson Hewitt filed such a report, Jackson Hewitt's total revenues in 2010 were about $213.8 million.

30.     In August 2011, Jackson Hewitt Tax Service Inc. emerged from bankruptcy as a privately held company owned by Bayside Capital, the credit-oriented affiliate of private equity investment firm H.I.G. Capital. During the relevant period, H.I.G. Bayside Capital was actively engaged in the operations of Jackson Hewitt. For example, at least four seats on Jackson Hewitt Tax Service Inc.'s board of directors were appointed by H.I.G. Bayside Capital, including John Bolduc, Executive Managing Director of H.I.G. Bayside Capital, Jackson Craig, a Managing Director of H.I.G. Bayside Capital, Benjamin Taylor, a Principal at H.I.G. Bayside Capital, and Jason T. Eglit, an Associate at Bayside Capital, who served as directors of Jackson Hewitt Tax Service during the Class Period.

31.     In May 2018, Corsair Capital acquired Jackson Hewitt Tax Service Inc. from H.I.G. Bayside Capital. During the relevant period, Corsair Capital was actively engaged in the operations of Jackson Hewitt. At least three seats on Jackson Hewitt Tax Service Inc.'s board of directors were appointed by Corsair Capital, including Nicholas B. Paumgarten, Chairman and Founder of Corsair Capital, Stephen Kretz, Vice President of Corsair Capital, and Jeremy S. Schein, Managing Director of Corsair Capital, who currently serve as directors of Jackson Hewitt Tax Service Inc.

32.     As stated in its 2018 Franchise Disclosure Document ("FDD"), Jackson Hewitt's total revenues for fiscal year 2018 were about $244.5 million.

8

I-1580339.1

33.     At its peak, Jackson Hewitt had over 7,400 company-owned and franchise locations that prepared more than 3.4 million tax returns in a single tax season.

34.     Today, Jackson Hewitt has nearly 6,000 office locations in the United States, with approximately 1,900 corporate-owned offices and 3,800 franchise offices. About half of all Jackson Hewitt offices are located inside Wal-Mart stores. There are both corporate-owned and franchise locations in virtually every state and the District of Columbia. Jackson Hewitt is, and has been throughout the Class period, the second-largest tax preparation firm in the United States.

a.     **Jackson Hewitt's Franchise Model**

35.     Jackson Hewitt franchisees throughout the United States operate on standardized terms pursuant to a common franchise license agreement. They are competitors with Jackson Hewitt and with each other.

36.     Jackson Hewitt franchise offices operate as independent companies and separate economic entities from Jackson Hewitt.

37.     Jackson Hewitt franchisees are independent contractors. Such franchisees independently own and operate their businesses. As stated in Jackson Hewitt's standard franchise agreement, Jackson Hewitt franchisees function in an "independent contractor" relationship with Jackson Hewitt Defendants.

38.     As Jackson Hewitt makes clear in its standard franchise agreement to Jackson Hewitt franchisees, "[y]ou acknowledge that you are an independent contractor and that no principal-agent, partnership, employment, joint venture or fiduciary relation exists between you and us."

39.     Jackson Hewitt further makes clear in its standard franchise agreement to Jackson Hewitt franchisees that, "[y]ou are not authorized to make any contract, warranty or representation, or incur any obligation on our behalf," and that "[t]his Agreement is solely a license to use our Marks in a tax return preparation business using our Operating System."

40.     Moreover, Jackson Hewitt's standard franchise agreement indicates that its franchisees compete with each other and with Jackson Hewitt's company-owned locations. The franchise agreement expressly notifies franchisees that, "you may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."

**b.      Jackson Hewitt's Independent Franchisees Exercise Sole and Complete Decision-Making Authority as to All Employment-Related Decisions of Jackson Hewitt Franchise Offices**

41.     Jackson Hewitt on the one hand, and the franchisees on the other, purport to make separate and independent decisions.

42.     Jackson Hewitt's standard franchise agreement states that all decisions related to employment are to be made entirely and independently by each franchisee. Further, it states that employees of the franchisee are not employees of Jackson Hewitt Defendants:

> Since you are an independent contractor, you have the sole right to control all aspects of your relationships with your employees and prospective employees, including all decisions regarding hiring, firing, training, supervision, discipline, scheduling (including if you use any scheduling modules we provide to you) and compensation (paying wages to and withholding and paying taxes) in respect of your employees . . . . Neither you, nor your manager or your employees shall be considered or represented as our employees or agents.

43.     Thus, as Jackson Hewitt's standard franchise agreement and FDD makes clear, Jackson Hewitt franchise locations are intended to compete, and do compete, with each other as well as with Jackson Hewitt corporate-owned locations. Each franchisee independently owns and

10

operates its franchise location(s) as such. Among other things, such franchisees possess and exercise sole and complete decision-making authority as to all employment-related decisions, including but not limited to recruitment, hiring, firing, advancement, promotion, staffing, compensation, conditions of employment, discipline and other day-to-day management of employees.

44.     But for the Conspiracy, and the conduct of Defendants and their agents and co-conspirators in furtherance thereof, each Jackson Hewitt franchisee would have been free to make its own market decisions relating to recruitment, hiring, firing, advancement, promotion, staffing, wages, conditions of employment, discipline, and other day-to-day management of employees.

45.     But for the Conspiracy, and the conduct of Defendants and their agents and co-conspirators in furtherance thereof, each Jackson Hewitt franchisee would have competed with other Jackson Hewitt franchisees and with Jackson Hewitt corporate-owned locations for employees and would have solicited and recruited employees from other Jackson Hewitt franchisees and from Jackson Hewitt corporate-owned locations.

C.     **The No-Poach Agreements Between and Among Competing Jackson Hewitt Locations Owned by Defendants and by Franchisees**

46.     Notwithstanding the franchise agreement's definition of the franchisor-franchisee relationship, Jackson Hewitt and its franchisees have agreed not to compete with respect to the recruiting, soliciting, or hiring of employees.

47.     As alleged herein, the Conspiracy, including the anticompetitive No-Poach agreement, was between and among separate economic actors pursuing separate economic interests such that the agreement deprives the marketplace generally and the Class members in

I-1580339 I

particular of the benefits of independent centers of decision making as well as the benefits of free and open competition.

48.     Jackson Hewitt and its franchisees entered into express contractual agreements forbidding competition for employees among franchisees and Jackson Hewitt's corporate-owned tax offices. In particular, the standard language in Jackson Hewitt's franchise agreements with all franchisees who executed franchise agreements during the Class Period includes an express No-Poach Clause that prohibits franchisees from soliciting, recruiting, or hiring employees of other Jackson Hewitt franchisees or of Jackson Hewitt or its subsidiaries.

49.     The relevant provision from the standard Jackson Hewitt franchise license agreement during the Class Period, entitled "Covenant Against Recruiting or Hiring Our Employees" provides that, during the term of the franchise agreement and for a period of two years afterward, the franchisee may not, without "prior written permission" from Jackson Hewitt "solicit, recruit, or hire, for a job position entailing tax preparation, tax preparation management or supervisory duties, or tax preparation instruction duties" any employee of Jackson Hewitt or its affiliates whose duties include(d) "management of or over company-owned or franchised stores, franchisee training, tax preparation software writing or debugging, tax return processing software writing or debugging, electronic filing of tax returns, tax return processing, processing support, tax return preparation, or tax return preparation advice or support." This prohibition against soliciting, recruiting, or hiring such employees remains in effect for one year after the termination of their employment with Jackson Hewitt or its affiliates.

50.     The No-Poach agreements were not intended or limited to simply protecting Jackson Hewitt's investment in training its employees at corporate-owned offices. After all, the franchise offices' employees were required to meet the same training requirements.

12

51.     The restriction placed on franchisees from poaching **employees from other franchisees** further underscores the true purpose and value of the No-Poach Clause and surrounding policies to Jackson Hewitt: restricting competition for employees in the market and artificially suppressing wages among competing firms in a highly specialized sector.

52.     While the No-Poach Clause in the standard franchise license agreement ostensibly placed an obligation only upon franchisees, Jackson Hewitt operated under the same policy to effectuate and enforce the Conspiracy. The purpose and effect of this provision is to enforce and perpetuate the Conspiracy, in particular, by identifying and preventing violations of the agreement.

**D.     Employee Recruitment, Hiring, and Training**

53.     As one of the largest providers of tax preparation services in the United States, Jackson Hewitt has needs workers trained not only in tax preparation and assistance but also in Jackson Hewitt's System. The same is true for Jackson Hewitt franchisees.

54.     At the height of the 2018 tax season, Jackson Hewitt's corporate and franchise owned locations employed over 25,000 individuals, including tax professionals, most of whom were seasonal.

55.     Due to the seasonal nature of tax preparation and related services, Jackson Hewitt and its franchisees recruit and hire a large number of new or returning employees every year. As Jackson Hewitt highlights in its 2010 Form 10-K disclosure to the Securities and Exchange Commission, "[w]e generate substantially all our revenues during the period from January 1 through April 30," which "presents a number of operational challenges for us and our franchisees" such as the ability to maintain "flexible staffing" to meet its seasonal staffing needs

"because the number of employees at our network's offices during the peak of the tax season is exponentially higher than at any other time[.]"

56.     Jackson Hewitt's 10-K further underscores the importance of recruiting and hiring large numbers of qualified tax preparers each tax season in disclosing that, if "we were to experience significant business interruptions during the tax season, which may be caused by labor shortages" or other significant events, "we could experience a loss of business, which could have a material adverse effect on our business, financial condition and results of operations."

57.     Moreover, Jackson Hewitt states that its "[a]ctual results may differ materially from those contemplated (expressed or implied) by [its] forward-looking statements" in its 10-K due to "potential risks and uncertainties" such as "our ability to successfully attract and retain key personnel," and that "[c]ompetition for executive, managerial and skilled personnel in our industry remains intense."

58.     As Jackson Hewitt recognized in its Form 10-K filing, the regular need each tax season for qualified tax preparation workers would otherwise lead to healthy competition between Jackson Hewitt, its franchise locations, and other companies providing tax preparation services, and thus, higher wages, benefits, compensation and other terms of employment. Instead, as part of its efforts to avoid "significant business interruptions during the tax season, which may be caused by labor shortages," in a labor market with "intense" competition, Jackson Hewitt conspired with its franchisees and other co-conspirators to restrict employee mobility and competition in the market, with the purpose and effect of reducing and restricting mobility and limiting and reducing wages, benefits, compensation and other terms of employment.

### a.     Jackson Hewitt Employee Training and Requirements

59.     To qualify for employment at Jackson Hewitt or its franchisees, each tax professional, as defined herein, must complete the entry level tax course, the Jackson Hewitt

14

Basic Tax Preparation Course, or demonstrate equivalent knowledge by passing an internal exam.

60.     Jackson Hewitt's Basic Tax Preparation Course takes about 70 hours to complete.

61.     Upon completion, tax professionals obtain a Jackson Hewitt Certification. This Certification is a prerequisite for most if not all tax preparation jobs at Jackson Hewitt corporate or franchise locations.

62.     Jackson Hewitt and its franchisees require tax professionals to pass their internal exam every year.

63.     While Jackson Hewitt's Basic Tax Preparation Course covers general basic tax preparation skills, enrollees spend significant time learning skills specific to employment at Jackson Hewitt and its franchisees. For example, tax professionals at Jackson Hewitt must master working with ProFiler, Jackson Hewitt's proprietary interview-based tax preparation software. Because ProFiler is interview-based, it is designed and intended to be used by tax professionals servicing clients rather than by an individual preparing his/her own tax returns. And, because ProFiler is proprietary, it can be used only by Jackson Hewitt tax professionals. Thus, the knowledge and skills associated with use of ProFiler is specific to employment as a tax professional at Jackson Hewitt.

64.     Tax professionals may further enroll in Intermediate and Advanced Tax Courses at Jackson Hewitt.

65.     Jackson Hewitt's website makes clear that completion of Jackson Hewitt's 70-hour Basic Tax Preparation Course "is neither an offer nor a guarantee of employment" at

Jackson Hewitt or its franchisees, and "[a]dditional training, experience or skills may be required" for employment at Jackson Hewitt or its franchisees.

66.     Jackson Hewitt and its franchisees do not require tax professionals to have obtained degrees or general education levels. Rather, tax professionals must possess familiarity with Jackson Hewitt's products and services and selling techniques and be able to "[p]resent[] the Company's value proposition to clients concerning various company products and services and use[] prescribed selling techniques."

67.     These Jackson Hewitt tax courses and certifications, as well as familiarity with Jackson Hewitt's products, services, and selling techniques, are the primary qualifications for open tax professional positions at corporate-owned and franchise offices.

68.     With limited educational qualifications apart from dozens of hours invested in Jackson Hewitt-courses and familiarity with Jackson Hewitt's products, services, and selling techniques, many tax professionals at Jackson Hewitt's corporate-owned and franchise locations are uniquely suited to working at Jackson Hewitt or one of its franchise locations. Thus, employees should generally be highly mobile between and among Jackson Hewitt's corporate-owned and franchise offices.

69.     In the absence of Defendants' anticompetitive conduct, competition between and among Defendants and co-conspirators for Jackson Hewitt-trained workers in the highly specialized and technical tax preparation services industry, particularly within the Jackson Hewitt System, would be robust and would have increased and enhanced the workers' compensation and mobility.

### b.     The Jackson Hewitt System

70.     In addition to the Jackson Hewitt courses, certifications, products, services, and selling techniques discussed above, all tax professionals at Jackson Hewitt and its franchisees must gain familiarity with Jackson Hewitt's propriety Operating System.

71.     Each Jackson Hewitt corporate and franchise location must operate in accordance with Jackson Hewitt's "plan and system for preparing, checking and electronically filing income tax returns using our software, accounting methods, merchandising, equipment selection, advertising, promotional techniques, personnel training and quality standards that feature the Marks (the 'Operating System')." The Jackson Hewitt Operating System includes the Jackson Hewitt Operating Standards, Marks Standards, and Technology Standards.

72.     A Jackson Hewitt affiliate, Jackson Hewitt Technology Services LLC, provides various technology services specifically for the Jackson Hewitt Operating System.

73.     As a result of completing Jackson Hewitt tax courses, certifications, and internal exams, and acquiring specialized knowledge as to the Jackson Hewitt proprietary Operating System, including Operating Standards, Marks Standards, and Technology Standards, as well as Jackson Hewitt's proprietary ProFiler tax return preparation software, employment with a non-Jackson Hewitt tax preparation company or business is not a reasonable substitute for the employees of Jackson Hewitt and its franchisees.

### E.     The Purpose and Effect of the Conspiracy was to Restrict Mobility and Suppress Compensation for Jackson Hewitt Tax Professionals

### a.     Restricted and Reduced Mobility

74.     Defendants' Conspiracy has restricted and reduced mobility between Jackson Hewitt corporate-owned and franchise locations.

1-1580339.1

75.     The Conspiracy restricted employees' mobility by decreasing the pool of potential employers and eliminating competition. This, in turn, has led to suppressed wages, compensation, and other benefits, compounded over the long term of the Conspiracy.

76.     The Conspiracy and its harmful effects were not limited to tax professionals but extended to managers, executives, and other employees of Defendants.

### b.     Suppressed Compensation

77.     Jackson Hewitt and franchisee employees have roles in tax preparation, customer service, and administrative or management positions. For each of these roles, employees of Jackson Hewitt or its franchisees are paid below the national salary for similar job titles.

78.     For example, Jackson Hewitt Senior Tax Preparers have an average base pay of approximately $11.00 per hour, which annualizes to a yearly salary of $22,963, while the national mean annual salary for a senior tax preparer is $76,795. Jackson Hewitt Tax Preparers reportedly earn approximately $10.90 per hour, which annualizes to $22,714 while the national mean annual salary for tax preparers is $28,205.

79.     Figure 1 below shows approximate average earnings at Jackson Hewitt compared to national figures for comparable positions.

**Figure 1**

## Jackson Hewitt Average Salary v. National Average Salary
## Tax Employees

| Job Title | Jackson Hewitt | | National Average Salary | Percentage Below National Average |
| | Hourly Wage | Annual Salary | | |
| (1) | (2) | (2)*2080 (3) | (4) | (4)-(3)/(4) (5) |
| --- | --- | --- | --- | --- |
| 1. Certified Public Accountant | $ 15.0 | $ 31,200 | $ 84,235 | 63% |
| 2. Senior Tax Preparer | 11.0 | 22,963 | 76,795 | 70% |
| 3. Tax Manager | 16.6 | 34,507 | 107,018 | 68% |
| 4. Tax Preparer | 10.9 | 22,714 | 28,205 | 19% |

80.     But for the Conspiracy, employee compensation at Jackson Hewitt corporate-owned and franchise offices would be significantly higher.

### F.     Illegality and Anticompetitive Harm of Franchise No-Poach Agreements

81.     On or about July 9, 2018, the Attorneys General of ten states and of the District of Columbia announced an investigation into the anticompetitive hiring and recruiting practices and procedures used by several large franchise companies, and stated that:

> [W]e are concerned about the use of No Poach Agreements among franchisees and the harmful impact that such agreements may have on employees in our States and our state economies generally. By limiting potential job opportunities, these agreements may restrict employees' ability to improve their earning potential and the economic security of their families. These provisions also deprive other franchisees of the opportunity to benefit from the skills of workers covered by a No Poach Agreement whom they would otherwise wish to hire. When taken in the aggregate and replicated across our States, the economic consequences of these restrictions may be significant.

82.     To date, Jackson Hewitt has neither denied nor agreed to end its practice of including and enforcing No-Poach Agreements in franchise contracts.

### V.     CO-CONSPIRATORS AND AGENTS

83.     The anticompetitive and unlawful acts alleged against Defendants were authorized, ordered or performed by Defendants and their respective directors, officers, agents,

employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

84.     Individuals and/or entities not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

85.     Each Defendant acted as the principal, agent, or joint venturer of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein. The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed between the Defendant principals and agents.

86.     Accordingly, the Defendant principals are liable for the acts of their agents. Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied or apparent authority.

## VI.     CLASS ACTION ALLEGATIONS

87.      Plaintiff brings this action on behalf of himself and all others similarly situated (the "Class"), pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All tax professionals and managers who worked at any Jackson Hewitt location in the United States, whether owned and operated by Jackson Hewitt or by its franchisee, at any time between January 1, 2005, and the present.

The "United States" includes all fifty states, the District of Columbia, and all U.S. territories. "Tax professionals" includes any and all persons who worked at any Jackson Hewitt location during the Class period and whose duties included tax return processing or processing support, tax return preparation or preparation support, tax return preparation advice, operating,

20

writing, or debugging Jackson Hewitt propriety tax return software, or who had to complete Jackson Hewitt Tax Preparation Course(s) or demonstrate equivalent knowledge to qualify for his or her position at Jackson Hewitt. "Managers" includes any and all persons who worked at any Jackson Hewitt location during the Class period and whose duties included supervision or management of tax professionals as defined herein.

88.     Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of the Defendants or co-conspirators and their wholly owned subsidiaries, as well as personnel hired outside of the United States to work outside of the United States.

89.     Plaintiff does not yet know the exact size of the Class because such information is in the exclusive control of Defendants and the co-conspirators, but, based upon the nature of trade and commerce involved, as well as the scope and duration of the conspiracy, Plaintiff believes that there are at least thousands of Class members, and that Class members are geographically dispersed throughout the United States. Therefore, joinder of all members of the Class is not practicable.

90.     The questions of law or fact common to the Class include, but are not limited to:

   a.     whether the Conspiracy violated the Sherman Act;

   b.     whether the Conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act;

   c.     whether the Conspiracy and associated agreements restrained trade, commerce, or competition for labor;

   d.     whether Plaintiff and the Class suffered antitrust injury or were threatened with injury; and

I-1580339.1

e.   the type and measure of damages suffered by Plaintiff and the Class.

91.   These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

92.   Plaintiff's claims are typical of the claims of the Class.

93.   Plaintiff will fairly and adequately represent the interests of the Class and has no conflict with the interests of the Class.

94.   Plaintiff has retained competent counsel experienced in antitrust litigation, and specifically with respect to antitrust litigation involving agreements regarding hiring, recruiting, no-poach agreements, and Class action litigation to represent himself and the Class.

95.   Defendants and the co-conspirators have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

96.   This Class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a Class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a Class action. By contrast, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.   ANTICOMPETITIVE EFFECTS AND LACK OF PROCOMPETITIVE JUSTIFICATION

97.   The Conspiracy substantially reduced competition for labor. Defendants and the co-conspirators entered into, implemented and policed these agreements with the knowledge of the overall Conspiracy, and did so with the intent and effect of fixing, retraining and stabilizing the compensation paid to their personnel at artificially low levels.

I-1580339.1

98.     The harm not only reached individuals who sought to change their employment from one franchise or corporate office location to another, but also extended to those who had no intention of changing from one franchise or corporate office location to another, due to, *inter alia*, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

99.     While the Conspiracy constitutes a *per se* violation of the Sherman Act, Defendants and unnamed co-conspirators also exploited their collective market power in the relevant market, which is the labor market for tax professionals and managers at Jackson Hewitt, as defined herein, in the United States.

100.    Through their Conspiracy, Defendants exercised and maintained this power, and did in fact suppress wages, benefits and other aspects of compensation and eliminate competition.

101.    The Conspiracy and the conduct of Defendants and their agents and co-conspirators in furtherance thereof did not have procompetitive effects and were not intended to have procompetitive effects.

102.    In the alternative, Defendants are liable under a "quick look" analysis where one with even a rudimentary understanding of economics could conclude that the arrangements and agreements alleged would have an anticompetitive effect on Class members and markets.

103.    In the alternative, any procompetitive effects that may have resulted from the Conspiracy and/or the conduct of Defendants and their agents and co-conspirators in furtherance thereof were and are outweighed by the anticompetitive harm alleged herein, including but not limited to restricting employee mobility and suppressing wages, benefits and other aspects of compensation.

I-1580339.1

## VIII.   EQUITABLE TOLLING AND STATUTE OF LIMITATIONS

104.    While Plaintiff had knowledge of aspects of Defendants' and industry recruiting practices, Plaintiff had neither actual nor constructive knowledge of Defendants' unlawful conspiracy until, at the earliest, July 9, 2018. Nor did Plaintiff have any reason to suspect that Defendants were illegally acting in concert to suppress wages and the labor market. At no point did Defendants inform Plaintiff that their compensation was not competitive but was instead suppressed by Defendants' anticompetitive agreements. Plaintiff therefore did not know of, did not discover, and could not have discovered through reasonable diligence, the existence of the conspiracy outlined in the foregoing allegations.

105.    Conspiracies, by their nature, must be concealed. To keep the conspiracy hidden from those it affected most—their employees and prospective employees—Defendants and their co-conspirators did not publicize the No-Poach Clause of their franchise agreements. Defendants also did not inform employees of the Conspiracy between Jackson Hewitt and its franchisees during the application process or the new employee onboarding process.

106.    Defendants also concealed the fraud by giving false and pretextual explanations for hiring and compensation decisions, including that the decisions were based on merit, the operation of free and open competition, and other considerations, instead of pursuant to an unlawful agreement.

107.    As a result of Defendants' and their co-conspirators' successful efforts to conceal the facts and scope of the Conspiracy, the running of any applicable statute of limitations has been tolled with respect to Plaintiff's claims concerning Defendants' conspiracy.

I-1580339.1

## IX.   CLAIM FOR RELIEF

### (Violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3)

108.   Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint, and further alleges the following:

109.   Beginning no later than January 1, 2005, and continuing until the present, Defendants entered into and engaged in unlawful agreements in restraint of trade and commerce, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

110.   Defendants' agreements have included concerted actions and undertakings among themselves and their co-conspirators with the purpose and effect of: (a) fixing, reducing and stabilizing the wages, benefits and other aspects of compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants and their co-conspirators for labor.

111.   As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for labor, members of the Class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

112.   The unlawful agreements among Defendants and their co-conspirators have had the following effects, among others:

a.     competition among Defendants and their franchisees for labor has been suppressed, restrained, and eliminated; and

b.     Plaintiff and Class members have received lower compensation from Defendants and franchisees than they otherwise would have received in the absence of the Conspiracy and, as a result, have been injured in their property and have suffered damages in an amount subject to proof at trial.

I-1580339.1

113.     The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or committed by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

114.     Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Sections 1 and 3 of the Sherman Act.

115.     Accordingly, Plaintiff and Class members are entitled to three times their damages caused by Defendants' violations of Sections 1 and 3 of the Sherman Act, as well as the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction prohibiting Defendants from ever again entering into similar agreements in violation of the antitrust laws.

## X.     DEMAND FOR JURY TRIAL

116.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and the Class, demands a jury trial as to all issues triable by a jury.

## XI.     PRAYER FOR RELIEF

117.     WHEREFORE, Plaintiff prays that this Court enter judgment on his behalf and that of the Class by adjudging and decreeing that:

   a.     This action may be maintained as a Class action, with Plaintiff as the designated Class representative and his counsel as Class counsel;

   b.     Defendants have engaged in a trust, contract, combination, or conspiracy in violation of Sections 1 and 3 of the Sherman Act, and that Plaintiff and the Class members have been damaged and injured in their business and property as a result of this violation;

26

I-1580339.1

c.      The alleged combinations and Conspiracy are *per se* violations of the Sherman Act;

d.      Defendants are enjoined from attempting to enter into, entering into, maintaining, or enforcing any no-poach agreement, or other illegal anticompetitive agreement or understanding, as alleged herein;

e.      Judgment be entered for Plaintiff and Class members, and against Defendants, for three times the amount of damages sustained by Plaintiff and the Class, as allowed by law;

f.      Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law;

g.      Plaintiff and the Class recover their costs of suit, including attorneys' fees, as provided by law; and

h.      Plaintiff and the Class are entitled to such other and further relief as is just and proper under the circumstances.


Dated:  December 20, 2018                    Respectfully submitted,

/s/_____
Conrad M. Shumadine
VSB #4325
Counsel for Plaintiff and Proposed Class
Willcox & Savage, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, VA 23510
Telephone: (757) 628-5500
Fax: (757) 628-5566
cshumadine@wilsav.com

I-1580339.1

Joseph R. Saveri (*pro hac vice* to be submitted)
Steve N. Williams (*pro hac vice* to be submitted)
Jiamin Chen (*pro hac vice* to be submitted)
V Prentice (*pro hac vice* to be submitted)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, CA 94108
Tel: (415) 500-6800
Fax: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
jchen@saverilawfirm.com
vprentice@saverilawfirm.com

*Attorneys for Plaintiff and the Proposed Class*

28